UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK REYNOLDS,                               Case No. 21-10960

     Plaintiff,                          F. Kay Behm
v.                                           United States District Judge

KALITTA AIR, L.L.C.,

    Defendant.
_____ /

**ORDER GRANTING DEFENDANT'S**
**AMENDED MOTION TO DISMISS (ECF No. 32)**

## I.      INTRODUCTION

This matter is before the court on Defendant Kalitta Air's amended motion

to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and motion for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  (ECF No. 32).

Plaintiff Mark Reynolds filed his amended complaint against Defendant on April

28, 2021, alleging violations of the Family and Medical Leave Act (FMLA) (Count I,

Count II), violations of Michigan's Persons with Disabilities Civil Rights Act

(PWDCRA) (Count III), and intentional infliction of emotional distress (Count IV).

(ECF No. 2, PageID.22-34).  Specifically, Plaintiff argues that he was wrongfully

terminated by Defendant after contracting COVID-19 during a work-related

training session and was denied his right to request FMLA leave.  (ECF No. 2, PageID.18).  Defendant disagrees, arguing that Plaintiff never requested FMLA leave and was terminated for a reason wholly separate from his COVID-19 diagnosis.  (ECF No. 32, PageID.759).

Defendant filed an initial motion to dismiss on December 27, 2022, which was subsequently stricken to allow for compliance with District Judge Linda V. Parker's[1] order regarding the page limit for the motion.  (*See* ECF No. 25).  Defendant filed an amended motion to dismiss on December 29, 2022, (ECF No. 26), but withdrew this motion on January 19, 2023.  (*See* ECF No. 30).  Defendant also filed a stipulated order for partial dismissal on January 16, 2023 (ECF No. 28), which was stricken by Judge Parker on January 17, 2023, (ECF No. 29).

Defendant filed the present amended motion to dismiss on January 19, 2023, (ECF No. 32), Plaintiff filed his response on February 15, 2023, (ECF No. 36), and Defendant filed their reply on March 2, 2023, (ECF No. 37).  The court held a hearing on August 30, 2023, and both parties participated in oral argument.  (*See* ECF No. 39).  For the reasons stated below, the court **GRANTS** Defendant's motion.

---

[1] This case was originally before Judge Parker, but was reassigned to the undersigned on February 6, 2023.

## II.     FACTUAL BACKGROUND

Defendant is a "Part 121 Air Carrier" and a "leading provider of On-Demand air cargo transportation services around the world."  (ECF No. 32, PageID.759). Plaintiff was employed by Defendant as a pilot from approximately July 15, 2019, until his termination on August 21, 2020.  (ECF No. 36, PageID.1069).  Generally, all pilots employed by Defendant are represented by the Pilots' Union[2] and are covered by a Collective Bargaining Agreement (CBA).  (*See* ECF No. 32, PageID.771).  Additionally, beginning in June of 2020, all pilots employed by Defendant were covered by a separate COVID-specific Memorandum of Understanding (MOU), titled "COVID-19 Medical Measures."  (ECF No. 32-3).

Plaintiff's amended complaint describes the relevant facts as follows.  (*See* ECF No. 2).  On or around July 2, 2020, Plaintiff was informed by Defendant that, while attending a training session in Miami, Florida, he had been exposed to a co-worker who later tested positive for COVID-19.  *Id.*, PageID.21.  As a result, Plaintiff was instructed to end his training, fly home to Houston, Texas, and get tested for COVID-19.  *Id*.  Plaintiff received a positive COVID-19 diagnosis on or around July 3, 2020, and had to be admitted to the hospital on or around July 9,

---

[2] Defendant notes that the "Union representing the Pilots changed to the Air Line Pilots Association ('ALPA') before the expiration of this CBA at the end of 2020; however, the Teamsters Contract remained in effect through 2020."  (ECF No. 32, PageID.760 n.1).

2020, to be treated for the virus. *Id.*, PageID.22. Plaintiff was discharged from the hospital a week later but was unable to return to work immediately, as he was still recovering. *Id*. Plaintiff argues that "beginning around mid-August 2020, Defendant Kalitta told [him] that he should file a worker's compensation claim and resign" or, if he refused, he would be terminated. *Id*. Plaintiff did not resign and was terminated on August 24, 2020, but was told his termination would be retroactive to August 21, 2020. *Id*.

Defendant's Motion to Dismiss describes a slightly different sequence of events, beginning with Plaintiff's decision to upgrade his training to fly the B777 aircraft, rather than the B767 aircraft. (ECF No. 32, PageID.761). Defendant argues that, to be certified to fly a new type of aircraft such as the B777, "[p]ilots must pass [Federal Aviation Regulations] training." *Id*. Defendant claims "Plaintiff failed this training on February 6, 2020 – March 1, 2020 ('First Training Failure')," at which point they "had the right to terminate Plaintiff under the CBA due to Plaintiff's poor performance, skill and safety risk and because Plaintiff was still a 'Probationary Pilot.'" *Id.* (emphasis omitted). However, Defendant chose to use a "graduated disciplinary process," and a Training Review Board (TRB) hearing was held on March 9, 2020, to determine what additional training Plaintiff would need to complete for his B777 rating. *Id.*; *see also* ECF No. 32-8, "TRB Letter."

Defendant claims that Plaintiff continued his training, but failed a second time on May 12, 2020 ("Second Training Failure").  *Id.*, PageID.762 (emphasis omitted).  Defendant again held a TRB hearing, and it was determined that "Plaintiff would withdraw from B777 training and return to B767 aircraft, with the requirement that he requalify on B767 aircraft."  *Id.*; *see also* ECF No. 32-10, "TRB Letter."  Defendant claims that Plaintiff then failed his requalification training for the B767 aircraft on June 30, 2020 ("Third Training Failure").  *Id.*, PageID.763. Defendant argues that, as a result of this failure alone, they made the decision to terminate Plaintiff consistent with their internal policy.  *Id.* ("Kalitta always terminates Pilots after a Third Training Failure, rather than providing even more training.") (emphasis omitted).

Plaintiff's deposition testimony, as well as his response to Defendant's motion, describe yet another slightly different version of events.  (*See* ECF No. 32-15, Mark Reynolds Deposition; ECF No. 36).  Plaintiff argues that he began experiencing symptoms of COVID-19 on or around June 27, 2020, while at requalification training in Miami, Florida.  (ECF No. 36, PageID.1051).  Plaintiff alleges that he "advised the instructors Defendant assigned to administer his requalification training about his symptoms" and by June 29, 2020, he "told these same instructors that he could not continue with the testing because of his

deteriorating health." *Id.*; *see also* ECF No. 32-15, PageID.950 ("Approximately around the 27th, I started getting sick. I was telling my instructors I had – that I was – I couldn't concentrate.  It was like my head was foggy, I was waking up soaking wet, I had a fever.").  However, Plaintiff argues that his instructors "discounted [his] concerns, told him it was just nerves, and had him continue." *Id.*, PageID.1051-52.  Plaintiff eventually asked William Gonzalez to drive him to an urgent care center on July 1, 2020.  *Id.*, PageID.1052.  Plaintiff argues that, when he finally tested positive for COVID-19 on July 4, 2020, he had been sick for approximately eight to ten days.  *Id.*, PageID.1054.

## III.   ANALYSIS

### A.   Railway Labor Act Preemption

Defendant first argues that the court lacks subject matter jurisdiction to hear Plaintiff's claims because they are "minor disputes" subject to mandatory arbitration and, thus, are preempted by the Railway Labor Act (RLA).[3]  (ECF No.

---

[3] The court first notes that the CBA includes a provision which states: "[n]othing in this agreement shall be construed to extend the right to arbitrate a grievance concerning his discipline or discharge to a probationary Crewmember…[h]owever, a probationary Crewmember shall have the right to submit any grievance."  (ECF No. 32-2, PageID.841).  The plain language of this section gives probationary employees the right to participate in the grievance process regarding their discharge or discipline, but specifically precludes their ability to engage in arbitration for such claims.  The Sixth Circuit has not definitively addressed whether the RLA's arbitral mechanisms can be waived as they apply to probationary employees, but several other circuits have held that similar waivers were valid.  *See CareFlite v.*

32, PageID.771). Defendant raises this argument pursuant to Fed. R. Civ. P. 12(b)(1), which requires a court to dismiss a claim over which it lacks subject matter jurisdiction. Fed. R. Civ. P 12(b)(1); (ECF No. 32, PageID.771). While some courts analyze RLA preemption as a jurisdictional issue under Fed. R. Civ. P. 12(b)(1), the Sixth Circuit has previously held that RLA preemption is not a jurisdictional issue, but rather concerns the "court's ability to reach the merits of a dispute and grant relief." *Emswiler v. CSX Transp., Inc.*, 691 F.3d 782, 790 (6th Cir. 2012). The Sixth Circuit is the lone circuit to take this approach and has seemingly moved away from their *Emswiler* holding in recent years. *See Yelder v. Norfolk S. Ry. Co.*, No. 21-1141, 2022 WL 18587845, at *3 (6th Cir. Aug. 12, 2022) ("*Yelder II*") ("As a preliminary matter, Norfolk, on appeal, challenges the district court's conclusion that Yelder's race discrimination claims are not precluded by the RLA. Because this argument **concerns the district court's subject matter jurisdiction**, we must assess it before reaching the merits.") (emphasis added) (citing *Miller v. Norfolk & W. Ry. Co.*, 834 F.2d 556, 561 (6th Cir. 1987) ("RLA

_____

*Off. And Pro. Emps. Int'l Union, AFL-CIO*, 612 F.3d 314, 321 (5th Cir. 2010) (holding that a provision stating "termination of employment resulting from a pilot's failure to obtain an ATP within the time requirements is non-grievable and non-arbitrable" was "unambiguous…and not capable of a construction that allows for arbitration of discharges for failure to obtain an ATP."); *see also Air Line Pilots Ass'n Int'l v. Delta Air Lines, Inc.*, 863 F.2d 87, 92-95 (D.C. Cir. 1988) (rejecting union's argument that RLA arbitration requirements cannot be waived or bargained away).

preemption divests the state and federal courts of subject matter jurisdiction over 'minor disputes.'") (quoting *Leu v. Norfolk & W. Ry. Co.*, 820 F.2d 825, 828 (7th Cir. 1987))).  However, regardless of whether this issue is analyzed as a jurisdictional question or as a question of the court's ability to reach the merits, the outcome in this case remains the same.

The RLA, which was extended to the airline industry in 1936, "sets up a mandatory arbitral mechanism to handle disputes 'growing out of grievances or out of the interpretation or application of'" CBAs.  *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994) (citing 45 U.S.C. § 153 First (i)).  Under this framework, employers and covered employees must resolve any disputes through the RLA's grievance and arbitration process, not through a lawsuit in federal court.  *See Dotson v. Norfolk Southern R.R. Co.*, 52 F. App'x 655, 658 (6th Cir. 2002) ("The [National Railroad Adjustment Board] has exclusive jurisdiction over minor disputes, and a party cannot bypass the Board and take the dispute into federal court, except to enforce the Board's award.") (citations omitted).  The RLA's arbitration and grievance mechanism separates disputes into two categories: "major disputes" and "minor disputes."  *Odell v. Kalitta Air, LLC*, No. 1:22-CV-12290, 2023 WL 4084490, at *5 (E.D. Mich. June 20, 2023).  The first category, "major disputes" are those relating to "the formation of collective [bargaining]

agreements or efforts to secure them." *Id.* (citations omitted). Neither party in

this case argues that Plaintiff's claims are major disputes. The second category,

"minor disputes," involve "controversies over the meaning of an existing

collective bargaining agreement in a particular fact situation." *Id.* at *5; *see also*

*Trainmen v. Chicago R. & I.R. Co.*, 353 U.S. 30, 33 (1957). In essence "major

disputes seek to create contractual rights" whereas "minor disputes seek to

enforce them." *Consol. Rail Corp. v. Ry. Lab. Executives' Ass'n*, 491 U.S. 299, 302

(1989).

To determine whether a question is a "minor dispute," the court must

utilize a two-part test: "[f]irst, the [] court must examine whether proof of the []

claim requires interpretation of the collective bargaining agreement terms.

Second, the court must ascertain whether the right claimed by the plaintiff is

created by the collective bargaining agreement or by state [or federal] law."

*Yelder II*, 2022 WL 18587845, at *2; *see also DeCoe v. Gen. Motors Corp.*, 32 F.3d

212, 216 (6th Cir. 1994). In this case, the key questions raised in Plaintiff's

amended complaint are: (1) whether Defendant interfered with Plaintiff's

exercise of his rights under the FMLA; (2) whether Defendant retaliated against

Plaintiff for attempting to exercise his rights under the FMLA; (3) whether

Defendant discriminated against Plaintiff in violation of Michigan's PWDCRA by

failing to offer reasonable accommodations; and (4) whether Defendant's conduct rose to the level of intentional infliction of emotional distress.  (*See* ECF No. 2, PageID.22-34).  Plaintiff first argues that preemption cannot apply in this case because he was not a "covered employee" under the relevant CBA.  (ECF No. 36, PageID.1063).  However, the language of the CBA and other relevant circumstances suggest it applied to Plaintiff, even as a "probationary crewmember."  The CBA not only defines a "probationary crewmember," but also gives them the "right to submit any grievance."  (ECF No. 32-2, PageID.841).  Additionally, Plaintiff received union representation at his RLA hearings and paid union dues.  (ECF No. 32-8, PageID.879) ("The meeting was attended by David Novotny (Chief Pilot) and Timothy Chase (Union Representative).").  Likewise, the court finds this argument has no merit and will engage in the Sixth Circuit's two-step analysis to determine whether the questions presented are "minor disputes."

First, the court must consider whether Plaintiff's claims require "interpretation of the collective bargaining agreement terms."  *Yelder II*, 2022 WL 18587845, at *2.  It has been noted that requiring a court to *interpret* a CBA is not the same as requiring a court to merely *consult* a CBA in the course of evaluating a plaintiff's claim.  *See Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 873 (7th Cir.

2011) ("The mere need to consult a collective bargaining agreement does not require preemption.").  Similarly, it has been held that purely factual questions about an employer or employee's conduct and motives are not considered minor disputes.  *Yelder II*, 2022 WL 18587845, at *2 (citing *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)).  To effectively illustrate the difference between "interpreting" a contract and simply "consulting" it, District Judge Terrence G. Berg utilized the following hypothetical in *Yelder v. Norfolk S. Ry. Co.*, No. 2:18-cv-10576-TGB, 2020 WL 1083785, at *8 (E.D. Mich. Mar. 6, 2020) ("*Yelder I*"):

> Suppose that a lease requires payment by the tenant on the first of the month.  The plaintiff argues she paid on the first of the month while the defendant argues the plaintiff violated the lease by paying five days late.  The plaintiff is not challenging the meaning of the terms "payment is due on the first of the month;" the question is whether – as a matter of fact – the plaintiff complied with the terms of the lease.  In this example, determining whether the plaintiff paid her rent in compliance with the lease requires reference to the lease but not interpretation of the lease.

*Id*. (*aff'd, Yelder II*, 2022 WL 18587845, at *2 ("the district court properly concluded that, while the trier of fact would need to refer to the CBA to determine Norfolk's particular policies and procedures, there was no need to interpret the terms of the CBA because neither party disputes the terms.")).  In this case, the parties do not dispute the meaning of any of the CBA provisions

underlying Plaintiff's claims.  Relevant to Counts I and II, Plaintiff does not contest

the CBA's procedure for requesting FMLA leave,[4] the CBA's procedure for

determining FMLA eligibility,[5] or the MOU's medical leave policy.[6]  Instead, his

arguments center around whether he sufficiently requested FMLA leave and

whether he was, in fact, eligible under the terms of the statute and the CBA.

Relevant to Count III, Plaintiff does not contest Defendant's policies for training or

terminating employees, but instead argues that Defendant failed to offer

accommodations for his alleged disability.  Finally, relevant to Count IV, Plaintiff's

claim of intentional infliction of emotional distress requires the court to

undertake a purely factual inquiry into whether Defendant's conduct was

"extreme, outrageous, and beyond all possible bounds of decency."  (*See* ECF No.

2, PageID.34).  Because each of these factual questions posed by Plaintiff only

---

[4] Section 12(G) establishes the company's policies for FMLA leave.  It states: "Crewmembers eligible for leave under the federal Family Medical Leave Act ("FMLA") or comparable state law may request FMLA leave.  The company shall administer FMLA leave as follows…A crewmember on medical leave will not be placed on FMLA leave unless he chooses to be placed on FMLA leave."  (ECF No. 32-2, PageID.813).

[5] Section 12(G)(1) clarifies an employee's eligibility for FMLA leave: "The FMLA leave entitlement shall be based on a rolling twelve (12) month period, measured backward from the date a Crewmembers uses any FMLA leave."

[6] The MOU states: "The Pilot, if at home, will be placed on Sick Leave (for internal Company payroll and scheduling will be characterized as 'Sick COVID Leave') for the duration of the illness, evaluation, treatment, and/or quarantine."  ECF No. 32-2, PageID.849).

require the court to reference, or briefly consult, the underlying CBA, rather than directly "interpret it" they do not meet the first prong of the test.  As such, even without evaluating the second prong of the test, these do not qualify as "minor disputes."  Plaintiff's claims are, therefore, not preempted by the RLA and the court will proceed to the underlying merits of Defendant's motion to dismiss.

      B.    <u>Motion to Dismiss and for Summary Judgment</u>[7]

      Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing that a fact "cannot be or is genuinely disputed," and "must support the[ir] assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

---

[7] Defendant raises these claims as both a motion to dismiss for failure to state a claim under Rule 12(b)(6) and as a motion for summary judgment under Rule 56.  However, Defendant's sole argument on their motion to dismiss does not address an alleged failure to state a claim, but instead argues the court lacks subject matter jurisdiction under Rule 12(b)(1). (ECF No. 32, PageID.771) ("Pursuant to Fed. R. Civ. P. 12(b)(1), a Court must dismiss a claim over which it lacks subject matter jurisdiction.").  Additionally, Plaintiff's motion was not filed in lieu of an answer or otherwise in the normal time frame for a 12(b)(6) motion to dismiss.  Fed. R. Civ. P. 12(b).  Likewise, the court will analyze Defendant's substantive claims under the summary judgment standard.

Fed. R. Civ. P. 56(c)(1).  The facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

Once the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue then shifts to the non-moving party.  *Celotex Corp.*, 477 U.S. at 322-23.  The nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Id.*  Mere allegations or denials will not satisfy this burden, nor will a "scintilla of evidence" supporting the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The court's role in motions for summary judgment is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

Defendant's motion raises four main arguments: (1) this court should grant summary judgment and dismiss Plaintiff's FMLA claims because he did not meet the statutory requirements, (2) this court should grant summary judgment and dismiss Plaintiff's FMLA retaliation claim because their sole reason for terminating him was his three training failures and lack of certification, (3) this court should grant summary judgment and dismiss Plaintiff's PWDCRA claims because he does

not state a prima facie claim for discrimination, and (4) this court should grant summary judgment and dismiss Plaintiff's intentional infliction of emotional distress claim because their conduct was not intentional.  (*See* ECF No. 32).  The court will address each of these arguments in turn.

> i.   *FMLA Interference Claim*

Plaintiff's complaint first argues that he was an "eligible employee" under the FMLA, he had a right to FMLA leave, and Defendant's "actions and termination of Plaintiff interfered with his attempt to exercise his right of entitlement to leave under the FMLA."  (ECF No. 2, PageID.27).  The FMLA "entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 506 (6th Cir. 2006) (citing *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005); 29 U.S.C. § 2612(a)(1)(D)).  To prevail on a claim for FMLA interference, a plaintiff must first establish their entitlement to FMLA leave, which requires that:

> (1) [plaintiff] was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) [plaintiff] was entitled to leave under the FMLA, (4) [plaintiff] gave the employer notice of his intention to take leave, and (5) the employer denied the employee FMLA benefits to which [plaintiff] was entitled.

*Edgar*, 443 F.3d at 506 (citations omitted).  As an initial matter, there is no dispute that Defendant qualifies as an "employer" under the FMLA.  (ECF No. 2, PageID.23) ("Defendant Kalitta Air employed over 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year and within a 75-mile radius from the location in which Mr. Reynolds worked.").  However, Plaintiff has failed to establish that he was an eligible employee, he was entitled to leave under the FMLA, or that he gave the requisite notice of his intention to take FMLA leave.

Under the FMLA, an "eligible employee" is defined as "an employee who has been employed…for at least 12 months by the employer to whom leave is requested; and…for at least 1,250 hours of service with such employer during the previous 12-month period."  29 U.S.C. § 2611(2)(A).  Under both the statutory definition and the CBA, the date FMLA leave begins is the date used to determine an employee's eligibility.  29 C.F.R. § 825.110; (ECF No. 32-2, PageID.814) ("The FMLA leave entitlement shall be based on a rolling (12) month period, measured backward from the date a Crewmember uses any FMLA leave.").  Plaintiff does not dispute that he was hired on July 15, 2019.  (*See* ECF No. 36, PageID.1051).  Plaintiff's COVID-related medical leave began on approximately July 3, 2020 when

he received a positive COVID-19 diagnosis.  *Id.*, PageID.1057.  There is no dispute

that Plaintiff had not worked for Defendant for a full 12 months as of July 3, 2020.

Likewise, at that point, Plaintiff did not fall under the definition of an "eligible

employee" entitled to FMLA leave.

Even if Plaintiff were eligible for FMLA leave, there is no evidence that he

ever requested FMLA leave or gave his employer notice that he intended to do so.

Under the terms of the CBA and the MOU, Plaintiff was eligible for the company's

COVID-19 medical leave policy, which stated "[i]f a Pilot tests positive for COVID-

19, and is required to quarantine or otherwise avoid work...the following will

apply: the Pilot, if at home, will be placed on Sick Leave (for internal Company

payroll and scheduling will be characterized as 'Sick COVID leave'[8]), for the

duration of the illness, evaluation, treatment, and/or quarantine."  (ECF No. 32-3,

PageID.848).

Both the CBA and the statutory language of the FMLA require an employee

to affirmatively request FMLA leave.  *Anderson v. McIntosh Const., LLC*, 597 F.

App'x 313, 314 (6th Cir. 2015) ("To satisfy the FMLA's notice requirement, an

---

[8] Defendant describes "Sick COVID Leave" as "<u>paid leave</u>, meaning he retained his health insurance and other benefits, was paid full pay for 6 weeks, no deduction from accrued sick leave bank, and continue to accrue Longevity."  (ECF No. 32, PageID.779).

employee must request leave and provide enough information for her employer to know that the FMLA applies to the request.") (citation omitted); (ECF No. 32-2, PageID.814) ("[a] crewmember on medical leave will not be placed on FMLA leave unless he chooses to be placed on FMLA leave.").  The exhibits attached to Defendant's motion demonstrate that Plaintiff kept Defendant well-informed about his test results and recovery status once he was released from the hospital. (*See* ECF No. 32-22).  However, the exhibits do not demonstrate that Plaintiff kept Defendant well-informed about any intention to take FMLA leave.  Plaintiff even testified at his deposition that he "didn't know enough about [FMLA leave] to ask the company."[9]  (ECF No. 32-15, PageID.955, deposition of Mark Reynolds).  As such, even viewing the facts in the light most favorable to the Plaintiff, he has not met his burden to show that he was eligible for FMLA leave or that he affirmatively requested FMLA leave pursuant to the terms of the statute or the CBA.  There is no question of fact remaining as to this issue, summary judgment is appropriate, and Plaintiff's FMLA interference claim is dismissed.

---

[9] The full question asked was "Did you, Mr. Reynolds, ever contact the company, you personally, about going on family leave?"  He responded: "Again I didn't know enough about this to ask the company."  Plaintiff later restated this, saying "Okay. Again, as I answered, I did not know enough about family medical leave to ask the company about going on medical leave or going on family leave."  (ECF No. 32-15, PageID.955).

ii.    *FMLA Retaliation Claim*

Plaintiff's complaint next argues that "Defendant retaliated against Plaintiff for exercising his rights under the FMLA…" (ECF No. 2, PageID.28). To establish a prima facie case of FMLA retaliation, a plaintiff must show:

> (1) [he] was engaged in an activity protected by the FMLA; (2) the employer knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012). However, as a preliminary matter, an employee who is not eligible for FMLA leave cannot bring a FMLA retaliation claim. *See Davis v. Michigan Bell Tel. Co.*, 543 F.3d 345, 354 ("To the extent she is claiming that she was terminated because of her attempt to obtain FMLA leave…her claim must fail as a matter of law because she was not eligible for FMLA benefits") (citing *Humenny v. Genex Corp.*, 390 F.3d 901, 905-06 (6th Cir. 2004) (holding that an FMLA retaliation claim cannot be maintained by one who was not an eligible employee)). As discussed above, Plaintiff had not been employed by Defendant for 12 months as of July 3, 2020, and was not an "eligible employee."

However, even if Plaintiff were eligible for FMLA leave, his retaliation claim fails for the same reasons as his interference claim.  There is no additional evidence suggesting he affirmatively requested FMLA leave or gave his employer notice that he intended to do so.  Likewise, there is no reasonable way Defendant "knew that [he] was exercising his rights under the FMLA" or could have "[taken] an employment action adverse to [him]" as a direct result.  *See Donald*, 667 F.3d at 761.  Because Plaintiff again fails to demonstrate a question of fact remains as to his FMLA retaliation claim, summary judgment is appropriate, and this claim must also be dismissed.

### iii.    Persons with Disabilities Civil Rights Act (PWDCRA) Claim

Plaintiff's complaint next argues Defendant violated Michigan's Persons with Disabilities Civil Rights Act (PWDCRA) by refusing to offer reasonable workplace accommodations and firing him "because he asked for or because Defendant believed he would need workplace accommodations."  (ECF No. 2, PageID.31).  Michigan's PWDCRA provides that an employer shall not "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position."  Mich. Comp. Laws § 37.1201(1)(b).  To establish a prima facie case of

discrimination, a plaintiff must show that: "(1) he is "disabled" as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute." *Chiles v. Mach. Shop, Inc.*, 238 Mich. App. 462, 473 (1999).

Defendant first argues that Plaintiff cannot show he was "disabled" under the PWDCRA because he was suffering from a temporary medical condition. (ECF No. 32, PageID.785). Under the statute, a "disability" is defined as a "determinable physical or mental characteristic of an individual" if the characteristic "substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment and promotion." Mich. Comp. Laws § 37.1103(d)(i). A disability "normally does not include temporary medical conditions, even if those conditions require extended leaves from work." *Chiles*, 238 Mich. App. at 479 (citing *Halperin v. Abacus Technology Corp.*, 128 F.3d 191, 199 (4th Cir. 1997)). Defendant cites to a number of federal courts that have reached differing results as to whether COVID-19 is considered a "disability" under the Americans with

Disabilities Act.  (*See* ECF No. 32, Page ID.787-86).  However, under Michigan law, the circumstances suggest that Plaintiff's illness was "temporary" rather than a "disability" under the statute.  Michigan courts have previously noted that "the types of impairments that are generally temporary are often commonly shared by many in the general public...the intent of the Legislature...was that disability discrimination claims be available only to those with characteristics that are not commonplace and are not directly related to the ability to do the job." *Chiles*, 238 Mich. App. at 480 (citing *Fuqua v. Unisys Corp.*, 716 F.Supp. 1201, 1207 (D. Minn. 1989)).  Plaintiff does not provide any specific allegations tending to show that his illness was more than temporary.

Even if Plaintiff's illness could be considered a disability under the statute, Defendant argues that Plaintiff's firing was not related in any way to his COVID-19 diagnosis or illness.  (ECF No. 32, PageID.782) ("Emails show that Kalitta was ready to terminate Plaintiff on July 1, 2020, which in fact is Prior to...Plaintiff testing positive.").  At the time of his termination, Plaintiff was a "probationary Crewmember" under the terms of the CBA.  (ECF No. 32-2, PageID.804) ("a Crewmember will be on Probation until he has accumulated twelve (12) Months of Active Service from his Date of Hire as a Crewmember...").  As a probationary crewmember, Defendant had the ability to fire Plaintiff at will.  *Id.*, PageID.841

("Nothing in this agreement shall be construed to…require that such discipline or discharge be based on just cause.").  While Defendant was not required to present any reasoning or cause for terminating Plaintiff, they presented evidence that he was fired pursuant to company policy after his third training failure.  (ECF No. 32-12, PageID.925, email from William Rhodes to David Novotny) ("I have reviewed Mr. Reynold's [sic] training records. Pursuant to CBA Section 16.I.2.a, the Company will discontinue any training for Mr. Johnson based on his past performance.").

Plaintiff argues that a reasonable accommodation would have been to suspend his training until he recovered from COVID-19, but he has provided no concrete evidence that anyone was aware he was feeling sick during his training. (*See* ECF No. 32-17, PageID.970, deposition of William Gonzalez) ("If he would have said that he was not feeling well whether COVID, no COVID, then I would have told him that he needs to call in sick. I don't teach a class with a student that's feeling ill."); (ECF No. 32-19, PageID.996, deposition of David Novotny) ("I know that if he was – if I had known that he was sick or had symptoms or anything, we certainly wouldn't have let him perform any company duty."). Plaintiff has also provided no evidence that he specifically asked for training to be

suspended until he fully recovered.[10]  Without concrete proof that Defendant's

employees were aware of any illness at the time Plaintiff failed his training, it is

not reasonable to assume he was fired or retaliated against "because he asked for

or because Defendant believed he would need workplace accommodations."

(ECF No. 2, PageID.30).  Pursuant to the CBA, Defendant could have fired Plaintiff,

a probationary crewmember, at any time and for any reason, and they exercised

their ability to do so.  Even viewing the facts in the light most favorable to

Plaintiff, he has failed to demonstrate that a question of fact remains as to his

PWDCRA claim.  As such, summary judgment is appropriate, and this claim must

also be dismissed.

> iv.   IIED Claim

Finally, Plaintiff's complaint alleges Defendant's conduct was so intentional

or reckless that it rose to the level of intentional infliction of emotional distress.

(ECF No. 2, PageID.33).  To establish a claim of intentional infliction of emotional

distress under Michigan law, a plaintiff must show: "(1) extreme and outrageous

---

[10] A union representative, Michael Intfen, did request the company, "give consideration to continuing his training for one more attempt at qualifying as we cannot be certain that COVID-19 did not play a role in his most recent training difficulties."  (ECF No. 32-13, PageID.920, email from Michael Intfen to William Rhodes and David Novotny).  However, according to the materials provided to the court, this was the first request made for such an accommodation and was made over a month after William Rhodes already decided to discontinue Plaintiff's training on July 1, 2020.  *Id.*, PageID.925.

conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Hayley v. Allstate Ins. Co.*, 262 Mich. App. 571, 577 (2004). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.*; *see also Parker v. Midwest Loan Servs., Inc.*, No. 15-11708, 2016 WL 1242440, at *3 (E.D. Mich. Mar. 30, 2016). "It is for the trial court to initially determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id*. "But where reasonable individuals may differ, it is for the jury to determine if the conduct was so extreme and outrageous as to permit recovery." *Id.*

Defendant's decision to fire Plaintiff following his COVID-19 diagnosis did not involve harassment, threats, or other behavior that would meet the high standard for "extreme and outrageous" conduct under Michigan law. *See, e.g., Hayes v. Langford*, No. 280049, 2008 WL 5158896, at *1, 6 (Mich. Ct. App. Dec. 9, 2008) (holding that defendant's actions to "repeatedly insult[], berate[], ask[] whether plaintiff was a 'mental patient,' and threaten[] plaintiff with legal repercussions" in response to a 911 call in which plaintiff reported she had been shot created a genuine issue of material fact over whether the conduct was extreme or outrageous.); *Haverbush v. Powelson*, 217 Mich. App. 228, 234-35

(1996) (holding that conduct over a two-year period involving direct threats of physical harm "could appropriately be determined sufficiently extreme and outrageous."); *Margita v. Diamond Mortg. Corp.*, 159 Mich. App. 181, 190 (1987) (finding "continuous unnecessary harassment over a nearly two-year period…might easily be viewed as extreme and outrageous conduct under the circumstances.").  Additionally, Plaintiff has failed to plausibly show "Defendant failed to follow applicable COVID-19 safety rules and regulations and otherwise failed to implement appropriate safety measures to protect against COVID-19 transmission" to a degree that would be considered "outrageous."  (ECF No. 2, PageID.21).

Plaintiff points to *Jarvis v. Oakland-Macomb Obstetrics & Gynecology, P.C.*, No. 21-CV-10381, 2022 WL 1177165, at *2 (E.D. Mich. May 20, 2022), as a case which "previously rejected substantially identical arguments involving Covid-19 facts as involved with Defendant's motion."  (ECF No. 36, PageID.1077).  However, *Jarvis* presents a number of facts that can be distinguished from the present case. First, in *Jarvis*, the plaintiff argued that her employer refused to "(1) provide plaintiff and her coworkers with 'protective shields;' (2) notify plaintiff and her coworkers about work-related COVID-19 cases; (3) limit sonography/ultrasound appointments to patients only; (4) follow contact tracing protocol; or (5) institute

sufficient screening procedures." *Id.* at *2.  Additionally, the plaintiff alleged that

she attended a meeting with the defendants to express her concerns and was

"met with ridicule and called 'paranoid.'"  *Id.*  These specific allegations in *Jarvis*

are much different than the general and unsupported allegations in this case.

Specifically, Plaintiff argues that Defendant acted outrageously when requiring

"Plaintiff…and other employees [to] train in close quarters without masks, which

would have protected against the transmission of Covid-19."  (ECF No. 2,

PageID.21).  Defendant rebutted these allegations by submitting the official

"Kalitta Air Health Guidance for Flight crew" memorandum, dated March 20,

2020, which lists a number of safety guidelines in line with CDC and WHO

guidance (ECF No. 32-18), company policies requiring individuals to be screened

by "Thermal Screening Devices," (ECF No. 32-3, PageID.849), and highlighting that

Plaintiff was contacted on the same day as another Pilot tested positive, (ECF No.

32, PageID.766).  Considering all of Plaintiff's allegations, there is no question of

fact remaining that Defendant's conduct did not amount to "outrageous" conduct

that rises to the level of intentional infliction of emotional distress.  As such,

summary judgment is granted, and Plaintiff's claim is dismissed.

**IV.     CONCLUSION**

For the reasons stated above, the court finds there is no genuine issue as to any material fact remaining and Defendant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Defendant's amended motion to dismiss and motion for summary judgment (ECF No. 32) is **GRANTED.**  Counts I, II, III, and IV of Plaintiff's amended complaint are **DISMISSED** with prejudice**.**

**SO ORDERED**.

Date: September 15, 2023              s/ F. Kay Behm
                                      F. Kay Behm
                                      United States District Judge